# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

MELISSA ANN GLINN,            )
                              )
      Plaintiff,          )
                              )
v.                            )    Case No. CIV-16-85-SPS
                              )
NANCY A. BERRYHILL,           )
Acting Commissioner of the Social )
Security Administration,[1]   )
                              )
                              )
      Defendant.          )

## OPINION AND ORDER

The claimant Melissa Ann Glinn requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and REMANDED to the ALJ for further proceedings.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Ms. Berryhill is substituted for Carolyn Colvin as the Defendant in this action.

Security Act "only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the

---

[2] Step one requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. *Id*. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity, or if her impairment is not medically severe, disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant suffers from a listed impairment (or impairments "medically equivalent" to one), she is determined to be disabled without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must establish that she lacks the residual functional capacity (RFC) to return to her past relevant work. The burden then shifts to the Commissioner to establish at step five that there is work existing in significant numbers in the national economy that the claimant can perform, taking into account her age, education, work experience and RFC. Disability benefits are denied if the Commissioner shows that the claimant's impairment does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

**Claimant's Background**

The claimant was born on January 27, 1969, and was forty-five years old at the time of the administrative hearing (Tr. 156, 354). She completed two years of college, and has worked as a casino manager and sales clerk (Tr. 151, 395). The claimant alleges she has been unable to work since August 24, 2010, due to bipolar disorder, anxiety, seizures, heart disorder, sleep apnea, fibromyalgia, diabetes, and split personality (Tr. 122, 394).

**Procedural History**

The claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85, on October 29, 2012. Her applications were denied. ALJ James Bentley conducted an administrative hearing and found that the claimant was not disabled in a written opinion dated August 22, 2014 (Tr. 120-155). The Appeals Council denied review, so ALJ Bentley's written opinion is the final decision of the Commissioner for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He found the claimant retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), *i. e.*, she could lift/carry twenty pounds occasionally and ten pounds frequently, and stand/walk and sit six hours in an eight-hour workday, but that she had the additional postural limitations of occasionally stooping, crouching, crawling, kneeling, balancing, and climbing ramps and stairs. Furthermore, he found that she was unable to climb ropes, ladders, or scaffolds, and that she could have no exposure to unprotected heights and dangerous moving machinery. He determined that she needed a sit/stand option, defined as a temporary change in position every thirty minutes and without leaving the workstation so as not to diminish pace or production. Finally, he limited her to simple tasks with routine supervision, and occasional contact with co-workers and supervisors, but no work-related contact with the general public (Tr. 126). The ALJ concluded that although the claimant could not return to her past relevant work, she was nevertheless not disabled because there was other work that she could perform, *i. e.*, small products assembler, garment bagger, and electronics worker (Tr. 152).

## Review

The claimant's sole contention of error is that the ALJ erred in evaluating the opinions of two treating physicians, Dr. Mark Rubertus and Dr. Charles Van Tuyl. The Court agrees with the claimant, and the Commissioner's decision should therefore be reversed.

The ALJ determined that the claimant had the severe impairments of obesity, sleep apnea, seizure disorder (likely pseudoseizures), chronic pain syndrome, type II diabetes mellitus, tachycardia, hypertension, hyperlipidemia, history of left humeral shaft fracture, cervical radiculopathy, neck pain, mild cervical spinal stenosis, spondylitis, bipolar disorder, mood disorder NOS, panic disorder with agoraphobia v. PTSD, borderline personality disorder, and histrionic traits (Tr. 123). Relevant medical records reflect treatment notes from Dr. Rubertus for the claimant from 2007 through 2015. Notes reflect treatment related to various impairments, including seizure disorder (that was largely considered to be pseudoseizures), obesity, PTSD, fibromyalgia, type II diabetes, borderline personality disorder, sleep apnea, panic disorder, GERD (Tr., *e. g.*, 576-757, 1155-1166). Once the claimant's sleep apnea was diagnosed around 2011, Dr. Rubertus noted the claimant had more energy and reported feeling better (Tr. 600). On June 4, 2013, Dr. Rubertus noted that her somnolence and memory loss could be traced to her medications, but that her psychosis was *not* part of her medications (Tr. 1157).

In February 2010, the claimant underwent an inpatient/intensive outpatient treatment program at Carl Albert Community Mental Health Center. At discharge, she was stable on her medications and had learned coping skills. Her diagnoses included major depressive disorder (recent, severe, with psychotic features), and borderline personality disorder, and she was assessed with a Global Assessment of Functioning (GAF) score of 50 (Tr. 505). On March 16, 2011, the claimant was again treated for suicidal ideation and was assessed with a mood disorder NOS, rule out malingering, as well as borderline personality disorder, and was assigned a GAF of 24 (Tr. 503-504).

She was considered to be in stable condition, but had a high risk assessment regarding harm to self or others (Tr. 504).

Additionally, the record contains treatment notes from Dr. Van Tuyl, the claimant's psychiatrist, who treated the claimant from 2006, through at least 2009, when he completed a Medical Source Statement. Although the content of their appointments was largely suppressed for confidentiality purposes, the information available nevertheless reflects that her diagnoses included PTSD secondary to sexual abuse, sleep problems, bipolar I disorder, dissociative identity disorder, panic disorder with agoraphobia, with GAF scores ranging from 40-60 (Tr. 720-765). Further Behavioral Treatment notes from a different facility indicate the claimant in 2013 complained of worsening anxiety, irritability, and insomnia, and noted she had minimal improvement since admission to the service (Tr. 761-762).

On October 22, 2009, Dr. Van Tuyl completed a Medical Source Opinion of Ability to do Work-Related Activities (Mental), in which he indicated that the claimant had extreme limitation in five areas, including the ability to maintain attention and concentration for extended periods in order to perform simple tasks, the ability to work close to others without being distracted, and the ability to accept instructions and criticism from supervisors (Tr. 496-497). He stated that she was unable to plan and acted impulsively without a plan for long-term consequences, and stated that she had both manic and depressive episodes with her mood disorder, she may have dissociative identity disorder, and that she lacked social skills. He concluded, stating that he did not consider her employable (Tr. 497).

On February 19, 2013, Dr. Jack Howard completed a physical exam of the claimant, at which time he assessed her with bipolar disorder, anxiety, depression, fibromyalgia, diabetes, and tachycardia (Tr. 781-783). He further noted she had some limited range of motion of the back, neck, and shoulders, as well as weak heel/toe walking (Tr. 784-787). The claimant's restricted range of motion was again confirmed in May 2014 when an MRI revealed mild cervical spondylosis with no high grade central canal or foraminal stenosis, resulting in diagnoses of cervical radiculopathy, cervical spondylosis, neck pain, and low back pain (Tr. 1257-1258).

On February 22, 2013, Dr. Kathleen Ward conducted a mental status exam of the claimant (Tr. 978). Her diagnostic impression was that the claimant was a marginally reliable historian, who presented with very dramatic, extremely poor performance on certain tasks, with her borderline personality disorder and histrionic traits predominating (Tr. 981). Dr. Ward further noted the claimant was anxious and mood disordered, and recommended continued mental health care and to stay in talk therapy, also stating that the claimant's "presentation of emotional modulation is significantly worse than what is reported during physician visits" (Tr. 981). She assessed the claimant with mood disorder not otherwise specified and panic disorder with agoraphobia v. PTSD, as well as borderline personality disorder and histrionic traits (Tr. 981).

On September 11, 2013, Dr. Rubertus completed a number of forms related to the claimant's ability to perform work. In support of his statements regarding her inability to perform even sedentary work requirements, he cited her high anxiety, social phobia, poor concentration, and chronic pain (Tr. 1211). As to her pain, he noted her fibromyalgia,

PTSD, and panic disorder, indicating, *inter alia*, that her prescribed medication would totally restrict her from performing at a productive level of work, that pain causes such a reduction in basic mental work activities that rest and/or medication are necessary (Tr. 1212).

Sate reviewing physicians found that the claimant could perform light work but could never climb ladders/ropes/scaffolds, and was to avoid all exposure to hazards (Tr. 233-234, 267-268). As to her mental impairments, state reviewing physicians determined that she was moderately limited in the ability to understand and remember detailed instructions, carry out detailed instructions, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Furthermore, she was markedly limited in the ability to interact appropriately with the general public (Tr. 236-237, 270-271). The physician concluded that the claimant could understand, retain, and perform routine tasks on a sustained basis, she had difficulty with interpersonal relations and would perform better in jobs with limited requirements to interact with co-workers, would not interact well with the public, can work with normal supervision and in a setting where she can work mostly alone, and can adjust to the mental demands of the workplace and carry out simple instructions (Tr. 237, 271).

In his written opinion, the ALJ extensively summarized the evidence in the record, as well as the claimant's hearing testimony. As to Dr. Rubertus, he appeared to describe the content of every appointment she had with him over the years, and noted Dr. Rubertus's 2013 Medical Source Statement, also summarizing it at length (Tr. 128-146).

He then "acknowledged" that Dr. Rubertus had a long-term treating relationship with the claimant, but gave little weight to his opinion, finding that it was inconsistent with his treating notes and findings on examination (Tr. 147). Specifically, the ALJ found contradictory Dr. Rubertus's statement that the claimant's medications kept her from operating at a productive level for work with his treatment notes indicating that he was trying to wean her off multiple redundant medications (Tr. 147). The ALJ also noted that the claimant had been informed her seizures were not real, and his statements regarding trigger points were contradicted by consultative examiner Dr. Howard (Tr. 147). Finally, the ALJ pointed out that Dr. Rubertus stated the claimant needed to elevate her legs, but only one treatment note from 2009 referred to edema (Tr. 147). As to Dr. Van Tuyl, the ALJ noted that his assessment was completed prior to the alleged onset date, and gave it little weight because: (i) he stated she *may* have dissociative identity disorder but no subsequent provider had diagnosed her with such; (ii) although most of the records were suppressed for confidentiality, the GAF scores in the record suggest she had no more than moderate symptoms at the time; (iii) the claimant was dramatic in her presentation and suspected of malingering; and (iv) the extreme degree of limitation was lacking in objective medical evidentiary support (Tr. 147). The ALJ performed no separate analysis of Dr. Howard's or Dr. Ward's opinions, although he did refer to them at various points in the lengthy opinion, summarized them, and appeared to rely on them (Tr. 142-151).

Medical opinions from a treating physician are entitled to controlling weight if they are "'well-supported by medically acceptable clinical and laboratory diagnostic techniques . . . [and] consistent with other substantial evidence in the record.'" *See*

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004), *quoting Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). If a treating physician's opinion is not entitled to controlling weight, the ALJ must determine the proper weight to give it by analyzing the factors set forth in 20 C.F.R. §§ 404.1527 and 416.927. *Id.* at 1119 ("Even if a treating physician's opinion is not entitled to controlling weight, '[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§ 404.1527 and 416.927].'"), *quoting Watkins*, 350 F.3d at 1300. Those factors are: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins,* 350 F.3d at 1300-1301, *citing Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001) [quotation omitted]. Finally, if the ALJ decides to reject a treating physician's opinions entirely, "he must . . . give specific, legitimate reasons for doing so[,]" *id*. at 1301 [quotation marks omitted; citation omitted], so it is "clear to any subsequent reviewers the weight [he] gave to the treating source's medical opinion and the reasons for that weight." *Id*. at 1300 [quotation omitted].

The ALJ was required to evaluate for controlling weight any opinions as to the claimant's functional limitations expressed by her treating physicians. The ALJ's

analysis, as described above, falls short in this case for the opinions of Dr. Rubertus and Dr. Van Tuyl. The claimant asserts that the ALJ erred in his assessment by elevating the opinions of the consultative examiners above the claimant's treating physicians, and the Court agrees. Although the ALJ noted the proper analysis at the outset of step four, he failed to properly apply it when he chose to rely on consultative and reviewing physician opinions to discount the treating physicians. The government argues that the ALJ's weighing of the opinions in this way was valid because the ALJ relied on the objective findings of Dr. Howard, and that it was Dr. Ward's "clinical observations," rather than her opinion that the ALJ found inconsistent. However, such one-time examinations are not replacements for long-term treatment relationships. Indeed, much was made of Dr. Rubertus's own efforts to reduce the claimant's medications, which were stated to have caused many of her side effects, but ignored the fact that his assessments regarding her impairments remained even with the medications. For instance, Dr. Rubertus explicitly stated that the claimant's psychosis would remain even if her redundant medications had been removed. Additionally, the three reasons given for assigning little weight to Dr. Rubertus's opinion do not account for the longitudinal treatment record.

As to Dr. Van Tuyl's treating assessment, the ALJ noted that Dr. Ward believed her presentation was "significantly worse" than was reported during her treatment visits with Dr. Robertus. However, the extensive mental health treatment notes have all been suppressed except for diagnoses. Moreover, the ALJ made much of the two places in the record where the claimant was suspected of malingering (with Dr. Ward and at Carl Albert where the assessment was rule out malingering), without acknowledging even Dr.

-11-

Ward assessed her with histrionic traits, which is a diagnosable mental health condition. Additionally, the ALJ assigned little weight to Dr. Van Tuyl's assessment because she was stable on her medications in 2010 and only described as "moderately ill" at one point in 2013, although treatment records also indicate that she made minimal progress and she was hospitalized or placed in outpatient treatment on several occasions due to her mental impairments. It thus appears the ALJ made a number of assumptions about the claimant's mental health treatment in order to reject Dr. Van Tuyl's assessment.

Indeed, the ALJ devoted much of his discussion at step four to questioning his determination at step two, *i. e.*, the severity of the listed impairments. *See McCleave v. Colvin*, 2013 WL 4840477, at *6 n.6 (W.D. Okla. Sept. 10, 2013) ("Additionally, the ALJ found Plaintiff's subjective complaints not credible in part because of evidence of her noncompliance with prescribed psychotropic medications. However, the ALJ did not consider whether Plaintiff had an acceptable reason for failing to follow her prescribed treatment, *which could include her bipolar disorder*.") [emphasis added], *citing* 20 C.F.R. §§ 404.1530(c), 416.930(c) *and Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) ("ALJ's assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference."). This was an improper assessment where, as here, the ALJ appeared to devote much of his time at step four to pointing out the inconsistencies in the record rather than determining the claimant's RFC. *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001) (A reviewing court is "'not in a position to draw factual conclusions on behalf of the ALJ.'"), *quoting Prince v. Sullivan*, 933 F.2d 598, 603 (7th

Cir. 1991). *See also Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (noting that the ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."), *citing Switzer v. Heckler*, 742 F.2d 382, 385-386 (7th Cir. 1984) ("Th[e] report is uncontradicted and the Secretary's attempt to use only the portions favorable to her position, while ignoring other parts, is improper.") [citations omitted].

Moreover, it is evident that the ALJ failed to properly evaluate all of the claimant's impairments in combination, in particular failing to connect the repeated findings regarding the limited range of motion to the claimant's specific RFC, as well as the effect of the claimant's mental impairments on her physical impairments. This failure to consider all impairments—singly and in combination—was error at step four. *See Hill v. Astrue*, 289 Fed. Appx. 289, 292 (10th Cir. 2008) ("In determining the claimant's RFC, the ALJ is required to consider the effect of *all* of the claimant's medically determinable impairments, both those he deems 'severe' and those 'not severe.'").

Finally, the undersigned Magistrate Judge notes that the Social Security Administration eliminated the term "credibility" in Soc. Sec. Rul. 16-3p, 2016 WL 1119029 (Mar. 16, 2016), and has provided new guidance for evaluating statements pertaining to intensity, persistence, and limiting effects of symptoms in disability claims. "Generally, if an agency makes a policy change during the pendency of a claimant's appeal, the reviewing court should remand for the agency to determine whether the new policy affects its prior decision." *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (*quoting Sloan v. Astrue*, 499 F.3d 883, 889 (8th Cir. 2007).

Because the ALJ failed to conduct a proper assessment of the evidence in the record, the undersigned Magistrate Judge finds he did not properly consider it. Consequently, the decision of the Commissioner should be reversed and the case remanded to the ALJ for further proper analysis of the claimant's RFC in light of *all* the evidence and *all* of the claimant's impairments. If on remand there is any adjustment to the claimant's RFC, the ALJ should re-determine what work, if any, the claimant can perform and ultimately whether she is disabled.

## Conclusion

The Court hereby FINDS that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. The decision of the Commissioner is accordingly REVERSED and the case is REMANDED for further proceedings consistent herewith.

**DATED** this 22nd day of September, 2017.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**